IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MIKE G. and DANA M., individually and as guardians of A.G., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>BLUECROSS BLUESHIELD OF TEXAS,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER<br><br><br>Case No. 2:17-CV-347 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on cross Motions for Summary Judgment. For the reasons discussed below, the Court will grant in part and deny in part both Motions.

## I.  BACKGROUND

Plaintiffs Mike G. and Dana G., and their daughter A.G. (collectively, "Plaintiffs") had health insurance coverage under a group health benefits plan (the "Plan") insured by Defendant Blue Cross Blue Shield of Texas ("Blue Cross"). The Plan is an employee welfare benefits plan under the Employee Retirement Income Security Act ("ERISA").

### A.      THE PLAN TERMS

The Plan requires that "[a]ll services and supplies for which benefits are available under the Plan must be Medically Necessary."[1] Benefits are not available for "[a]ny services or supplies which are not Medically Necessary and essential to the diagnosis or direct care

---

[1] R. at 24.  The Joint Administrative Record consists of documents HCSC_MIKE G._00001 to HCSC_MIKE G._02504.  The Court will refer to the relevant record citation as R.__.

and treatment of a sickness, injury, condition, disease, or bodily malfunction."[2]

Medically Necessary or Medical Necessity means those services or supplies covered under the Plan that are:

> 1. Essential to, consistent with, and provided for the diagnosis or the direct care and treatment of the condition, sickness, disease, injury, or bodily malfunction; and
> 2. Provided in accordance with and are consistent with generally accepted standards of medical practice in the United States; and
> 3. Not primarily for the convenience of the Participant, his Physician, Behavioral Health Practitioner, the Hospital, or the Other Provider; and
> 4. The most economical supplies or levels of service that are appropriate for the safe and effective treatment of the Participant. When applied to hospitalization, this further means that the Participant requires acute care as a bed patient due to the nature of the services provided or the Participant's condition, and the Participant cannot receive safe or adequate care as an outpatient.
> The medical staff of BCBSTX shall determine whether a service or supply is Medically Necessary under the Plan and will consider the views of the state and national medical communities, the guidelines and practices of Medicare, Medicaid, or other government-financed programs, and peer reviewed literature. Although a Physician, Behavioral Health Practitioner or Professional Other Provider may have prescribed treatment, such treatment may not be Medically Necessary within this definition.[3]

The Plan provides that "Medically Necessary Mental Health Care or treatment of Serious Mental Illness in a Psychiatric Day Treatment Facility, a Crisis Stabilization Unit or Facility, or a Residential Treatment Center for Children and Adolescents, in lieu of hospitalization, shall be Inpatient Hospital Expense."[4]  However, "[r]esidential treatment centers for mental health services other than treatment for children and adolescents" are excluded.[5]

---

[2] *Id.* at 63.

[3] *Id.* at 78.

[4] *Id.* at 76.

[5] *Id.* at 66.

Mental Health Care includes:

1. The diagnosis or treatment of a mental disease, disorder, or condition listed in the *Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association*, as revised, or any other diagnostic coding system as used by the Carrier, whether or not the cause of the disease, disorder, or condition is physical, chemical, or mental in nature or origin;

2. The diagnosis or treatment of any symptom, condition, disease, or disorder by a Physician, Behavioral Health Practitioner or Professional Other Provider (or by any person working under the direction or supervision of a Physician, Behavioral Health Practitioner or Professional Other Provider) when the Eligible Expense is:

a. Individual, group, family, or conjoint psychotherapy,

b. Counseling,

c. Psychoanalysis,

d. Psychological testing and assessment,

e. The administration or monitoring of psychotropic drugs, or

f. Hospital visits or consultations in a facility listed in subsection 5, below;

3. Electroconvulsive treatment;

4. Psychotropic drugs;

5. Any of the services listed in subsections 1 through 4, above, performed in or by a Hospital, Facility Other Provider, or other licensed facility or unit providing such care.[6]

Serious Mental Illness, includes, among other things, depression in childhood and adolescence.[7]

A Psychiatric Day Treatment Facility is defined as "an institution which is appropriately licensed and is accredited by the Joint Commission on Accreditation of Healthcare Organizations as a Psychiatric Day Treatment Facility for the provision of Mental Health Care and Serious Mental Illness services to Participants for periods of time not to exceed eight hours in any 24-hour period."[8] A Crisis Stabilization Unit or Facility "means an institution which is appropriately licensed and accredited as a Crisis Stabilization Unit or Facility for the provision of

---

[6] *Id.* at 79.

[7] *Id.* at 83.

[8] *Id.* at 82.

Mental Health Care and Serious Mental Illness services to persons who are demonstrating an acute demonstrable psychiatric crisis of moderate to severe proportions."[9]  Finally, a Residential Treatment Center for Children and Adolescents is "a child-care institution which is appropriately licensed and accredited by the Joint Commission on Accreditation of Healthcare Organizations or the American Association of Psychiatric Services for Children as a residential treatment center for the provisions of Mental Health Care and Serious Mental Illness services for emotionally disturbed children and adolescents."[10]

B.     TREATMENT AT OUTBACK

A.G. received treatment at Outback Therapeutic Expeditions ("Outback"), an outdoor wilderness therapy program in Lehi, Utah, from February 7, 2014, to April 11, 2014.  A.G. did poorly at Outback and she was discharged from the program to begin treatment at Uinta Academy ("Uinta").  While en route to Uinta, A.G. ran away from her parents and spent the night in a hotel room with a group of men she did not know.

Blue Cross denied benefits for Outback on September 10, 2014.  The Explanation of Benefits identified the type of treatment A.G. received as "residential" and stated that "[t]his expense/service is not covered under the terms and conditions of your Health Care Plan.  No payment can be made."[11]  Plaintiffs appealed the denial, but Blue Cross did not respond.

---

[9] *Id.* at 71.

[10] *Id.* at 83.

[11] *Id.* at 1675.

C.     TREATMENT AT UINTA

After being discharged from Outback, A.G. was admitted to Uinta, a residential treatment center in Wellsville, Utah.  Upon admission, A.G. was diagnosed with cyclothymic disorder, oppositional defiant disorder, eating disorder not otherwise specified, and mathematics disorder.[12]  It was noted that she had a long history of parental conflict, compulsive lying, running away, defiant behavior, and depression.[13]  It was further noted that A.G. had no insight into her impulsive behavior and tended to avoid taking any accountability for it.[14]  As a result, she needed to be monitored closely.[15]

Dr. Bret Marshall conducted a psychiatric evaluation of A.G. on April 30, 2014.[16]  Dr. Marshall noted that A.G.'s behaviors had become increasingly egregious, including threatening suicide and running away from home.[17]  As a result, it was determined that she needed extended structure and help.[18]  At that point, A.G. denied any thoughts of suicide, self-harm, or homicide.[19]  She had no hallucinations or delusions, and her judgment was fair.[20]  However, her insight was limited.[21]  Dr. Marshall diagnosed A.G. with cyclothymic disorder, disruptive mood

---

[12] *Id.* at 1117.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at 1326–30.

[17] *Id.* at 1328.

[18] *Id.*

[19] *Id.* at 1330.

[20] *Id.*

[21] *Id.*

dysregulation disorder, alcohol related neurodevelopmental disorder, and specific learning disorder with impairment in mathematics, and prescribed medication.[22]

On May 7, 2014, A.G. reported to Dr. Marshall that it was easier for her to focus in school and that she had been doing better managing her impulses.[23] A.G. reported a good family visit.[24] Dr. Marshall noted that A.G.'s therapist at Uinta, Liz Beers, agreed that A.G. was doing better overall.[25] Dr. Marshall continued A.G. on her current medications.

By June 4, 2014, Dr. Marshall noted that A.G. struggled with respect and often laid in her bed, refusing to do anything.[26] Ms. Beers noted that A.G.'s irritability was very high.[27] As a result, Dr. Marshall increased her dose of Lamictal.[28]

In June 2014, A.G. had a "difficult visit" with her parents, which resulted in her parents calling Uinta staff when she became nonresponsive.[29] However, she had a good visit with her family in July and had an overnight visit.[30] She also went on a trip to Jackson Hole, Wyoming.[31]

On July 2, 2014, when A.G. saw Dr. Marshall again, she stated that she was "good" and that "[t]his month has been really good."[32] Dr. Marshall noted that A.G.'s sleep, appetite, and

---

[22] *Id.* at 1845.

[23] *Id.* at 1846.

[24] *Id.*

[25] *Id.*

[26] *Id.* at 1847.

[27] *Id.*

[28] *Id.*

[29] *Id.* at 1133.

[30] *Id.*

[31] *Id.*

[32] *Id.* at 1848.

energy were all good.[33]  Uinta staff also noted that A.G. was managing her frustration a lot better.[34]

Therapy treatment notes from August 8, 2014, state that A.G. received praise for working through her frustration.[35]  On August 11, 2014, it was noted that she participated appropriately in group therapy.[36]  A Treatment Plan Review completed on August 13, 2014, noted that A.G. had "not been out of instructional control since late June 2014, and has done this by working to regulate her irritability and anger response by use of deep breathing, goal setting, and personal mantras."[37]

A.G. again saw Dr. Marshall on August 13, 2014.  A.G. stated that she was "good" and was "doing pretty good in treatment."[38]  A.G. stated that she believes she focuses effectively and, when frustrated, "doesn't blow up like I used to."[39]  "I observe, describe, and participate."[40]  Uinta staff reported that they had seen "good improvement" in A.G. over the past couple of months and noted that she manages her impulses much more effectively.[41]  Ms. Beers agreed and

---

[33] *Id.*

[34] *Id.*

[35] *Id.* at 1127.

[36] *Id.* at 1128.

[37] *Id.* at 1132.

[38] *Id.* at 1849.

[39] *Id.*

[40] *Id.*

[41] *Id.*

noted that A.G. showed a strong amount of effort and her accountability was improving.[42]  That same day, A.G. had a positive attitude during and participated in group therapy discussions.[43]

On August 21, 2014, A.G. was "positive" and "engaged" at a group therapy session.[44] On August 26, 2014, A.G. had a "pleasant" attitude during group therapy and was able to talk about and work through her frustration.[45]  A.G. had a difficult visit with her mother and grandmother in August, which resulted in her mother calling A.G.'s therapist when she became argumentative at a restaurant.[46]

On September 5, 2014, A.G. became nonresponsive during a family therapy session and refused to participate in stress management.[47]  Treatment notes from September 9, 2014, indicate that A.G. had engaged in self-harm over the weekend, though she took accountability for her behavior.[48]

Dr. Marshall saw A.G. on September 10, 2014.  A.G. reported that she was "good," but admitted that a few days earlier she was "stressed" and "self-harmed."[49]  While she noted she had been feeling anxious, she also stated that she had done "pretty good" that day and the day before.[50]  Uinta staff reported that A.G. would do well for a certain period of time, but would

---

[42] *Id.*

[43] *Id.* at 1796.

[44] *Id.* at 1309.

[45] *Id.* at 1153.

[46] *Id.* at 1513.

[47] *Id.* at 1274.

[48] *Id.* at 1272.

[49] *Id.* at 1850.

[50] *Id.*

give up if she did not see the results she wanted.[51]  Ms. Beers noted that she was working with A.G. on this issue in therapy.[52]

On September 28, 2014, therapy notes indicate that A.G. made threats, but that she stated that she did not feel like harming herself in any way and signed a no self-harm contract.[53]  A.G. was aware of her pattern to escalate and make threats when she is upset and committed to working to change that pattern.[54]

At some point in September 2014, A.G. went to Yellowstone National Park.  In October, she went off campus with her parents for two overnights.[55]

On October 7, 2014, A.G. reported to Dr. Marshall that she was "doing pretty good" and "feeling happier."[56]  Dr. Marshall noted that they had prescribed clonidine and A.G. noticed that she was more positive taking that.[57]  Uinta staff noted that they had "seen a shift" with A.G.[58]  Her mood was not hyper, which was a benefit, and she "has been doing really well."[59]  Ms. Beers also reported an improved ability to focus.[60]  Dr. Marshall noted that A.G. had a bright affect, and was linear, polite, and focused.[61]  He noted that A.G. had "[i]mproved" and made no

---

[51] *Id.*

[52] *Id.*

[53] *Id.* at 1255.

[54] *Id.*

[55] *Id.* at 1513.

[56] *Id.* at 1851.

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

change in her medication.[62]  A therapy progress note from that day indicates that A.G. "reports having less difficulty and negativity in the mornings and improved ability to recognize when she needs to use her stress management skills."[63]

On October 10, 2014, Ms. Beers wrote a letter in connection with Plaintiffs' appeal of the denial of benefits.[64]  Ms. Beers noted that A.G. suffered from a lack of insight and had multiple relapses into poor behavior.[65]  She struggled with her relationship with her parents and had engaged in self-harming behavior.[66]  Overall, A.G. "has not shown sustained ability to control her impulses, communicate honestly, or even keep herself physically safe without high levels of structure and therapeutic support."[67]  Ms. Beers believed that if A.G. stepped down to a lower level of care, "she would be uncontrollable, unpredictable, and likely to harm herself or someone else."[68]  As a result, her continued "need for residential treatment is great if she is to succeed through to adulthood."[69]

On October 28, 2014, group therapy notes indicate that A.G. struggled to work cooperatively.[70]  Individual therapy notes state that A.G. used her skills to contribute to a

---

[62] *Id.*

[63] *Id.* at 1545.

[64] *Id.* at 1259, 1265.

[65] *Id.* at 1259.

[66] *Id.*

[67] *Id.*

[68] *Id.* at 1265.

[69] *Id.*

[70] *Id.* at 1527.

"positive family weekend."[71]  Treatment notes from the following day indicate that A.G. was doing well.[72]  On October 30, 2014, A.G. was positive and engaged in group therapy.[73]  That same day, her family reported an "excellent visit" and her parents "stated there is a visible change in her."[74]

The following two days, A.G. was "out of instructional control" "due to arguing with staff."[75]  However, "she was able to turn things around by using her mindfulness and distress tolerance skills."[76]

On November 4, 2014, A.G. was "calm and relaxed" during "a potentially frustrating situation."[77]  On November 11, 2014, A.G. had a "pleasant" attitude during group therapy.[78]  The same was true on November 18, 2014.[79]

On November 20, 2014, Ms. Beers noted that A.G. "continues to struggle with emotional regulation" and "has not demonstrated an ability to generalize her skills in her home environment."[80]  Despite this, A.G. left campus the following day with her mother for a visit.[81]  At her therapy session on November 25, 2014, A.G. reported that she had a good visit with her

---

[71] *Id.* at 1528.

[72] *Id.* at 1270.

[73] *Id.* at 1268.

[74] *Id.* at 1269.

[75] *Id.* at 1521.

[76] *Id.*

[77] *Id.* at 1523.

[78] *Id.* at 2118.

[79] *Id.* at 2123.

[80] *Id.* at 1514.

[81] *Id.* at 1511.

mother.[82]  While she became frustrated on three occasions, she was able to accept feedback and keep herself calm.[83]

On December 3, 2014, A.G. met with Dr. Marshall for medication management and she was continued on her medication.[84]  The following day, she was engaged and participatory in group therapy.[85]

On December 11, 2014, A.G. shut down emotionally at the end of a family therapy session after sharing a previously undisclosed trauma to her parents.[86]  Later that day, she was irritable during group therapy.[87]  On the days following, her attitude was pleasant and positive.[88] On December 16, 2014, A.G. reported symptoms of hypomania.[89]

A.G. returned home in December 2014 for the Christmas holiday.[90]  Upon her return to Uinta, she "reported she had a good visit."[91]  Though she became frustrated on one occasion, she was able to calm herself down.[92]

---

[82] *Id.* at 1504.

[83] *Id.*

[84] *Id.* at 2139.

[85] *Id.* at 2140.

[86] *Id.* at 2146.

[87] *Id.* at 2147.

[88] *Id.* at 2148, 2149.

[89] *Id.* at 2150.

[90] *Id.* at 2154.

[91] *Id.* at 2156.

[92] *Id.*

On January 8, 2015, A.G. was informed that her parents' relationship was ending.[93]  She "was able to stay engaged, manage her emotions, and stay mindful about the news."[94]  During a family therapy session with her father that day, A.G. "was able to stay present throughout the session."[95]  "She was very mature," she "did not shut down or become angry to the point where she had to leave," and "she was calm and collected and did not lash out."[96]  In a session with her mother and sister, A.G. remained calm throughout the session, was able to handle uncertainty, and expressed positivity.[97]

A.G. met with Dr. Marshall for medication management on January 13, 2015.  A.G. reported a good home visit, but stated that the past week had been rough.[98]  Therapy progress notes from January 14, 2015, indicate that A.G. was experiencing increased frustration and struggling to deal with it.[99]

During a family therapy session with her father on January 29, 2015, A.G. was "praised for her maturity."[100]  A few days later, she indicated that she was feeling positive about her relationship with her father.[101]

---

[93] *Id.* at 2159.

[94] *Id.*

[95] *Id.* at 2160.

[96] *Id.*

[97] *Id.* at 2162.

[98] *Id.* at 2170.

[99] *Id.* at 2171.

[100] *Id.* at 2182.

[101] *Id.* at 2187.

During a medication management appointment with Dr. Marshall on February 10, 2015, A.G. reported that she was doing well managing her frustration.[102]  On February 13, 2015, A.G. had a negative attitude during group therapy.[103]

In February 2015, A.G. went on a home visit.  Upon her return, she stated that she felt she did well but could use more work on accepting "no" for an answer.[104]

On March 9, 2015, A.G. had a depressed attitude and was disengaged during group therapy.[105]

In her March medication management appointment with Dr. Marshall, A.G. reported having a rough night and was having trouble dealing with her frustrations.[106]  Uinta staff confirmed that they noticed an increase in A.G.'s frustration level and that she was having trouble tolerating difficulties.[107]  Dr. Marshall adjusted A.G.'s medication.[108]

On March 13, 2015, A.G. initially had a negative attitude in group therapy, but "moved through some of her emotions and became more positive."[109]  On March 17, 2015, A.G. reported better sleep, better impulse control, better ability to accept consequences and feedback, and decreased irritability since her medication adjustment.[110]

---

[102] *Id.* at 2191.

[103] *Id.* at 2196.

[104] *Id.* at 2207.

[105] *Id.* at 2271.

[106] *Id.* at 2222.

[107] *Id.*

[108] *Id.*

[109] *Id.* at 2266.

[110] *Id.* at 2264.

In late March, A.G had a visit with her father. On March 23, 2015, she reported that the "visit went very well and that she has more confidence in her and her dad's relationship."[111] On March 30, 2015, A.G. was "very positive."[112] She was positive and engaged during group therapy.[113]

On April 1, 2015, A.G. struggled to accept feedback and consequences without expressing aggression or anger.[114]

On June 1, 2015, A.G. struggled with her affect.[115] By the next day, she was in a positive mood and was happy and helpful with her peers.[116] That night, however, she struggled again.[117] On June 3, 2015, A.G. struggled and was feeling discouraged.[118] On June 4, she was unable or unwilling to engage in group therapy.[119] On June 5, A.G. did well listening and accepting feedback, and was mostly positive.[120] On June 8, 2015, A.G. was happy, had a positive affect, stayed positive, and was encouraging with her peers.[121] On June 11, 2015, A.G. had a positive

---

[111] *Id.* at 2251.

[112] *Id.* at 2231.

[113] *Id.* at 2234.

[114] *Id.* at 2225.

[115] *Id.* at 2386.

[116] *Id.* at 2384.

[117] *Id.* at 2383.

[118] *Id.* at 2379–81.

[119] *Id.* at 2377.

[120] *Id.* at 2372.

[121] *Id.* at 2363.

affect, expressed feeling better, and was assertive and responsible.[122]  On June 16, 2015, Uinta staff stated that A.G. did a great job accepting feedback and asking for help.[123]

In mid-June, A.G. left for a home visit.  On June 26, 2015, she reported the visit a positive experience with minimal arguing.[124]  She reported "feeling much better."[125]  She did well for the next several days.[126]  However, she began to struggle after hearing that her family was going to put her dog down.[127]

A.G. was discharged from Uinta on December 6, 2015.  However, the record before the Court does not contain treatment notes after June 30, 2015.

D.      CLAIM PROCESS FOR UINTA

As stated, A.G. was admitted to Uinta on April 13, 2014.  On April 21, 2014, Kelly Walker, a Behavioral Health Care Coordinator at Blue Cross, conducted a review of A.G.'s claim and spoke to Ms. Beers.  Ms. Walker noted a history of depression and of threating self-harm and suicide.[128]  Ms. Walker noted that A.G. had no insight and poor judgment and impulse control.[129]  Ms. Walker stated that A.G. was initially on an "arms length safety precaution at admission," and was now on "elevated eye sight precautions/constant visual unless in

---

[122] *Id.* at 2351.

[123] *Id.* at 2335.

[124] *Id.* at 2294.

[125] *Id.*

[126] *Id.* at 2287, 2289, 2292, 2293.

[127] *Id.* at 2278.

[128] *Id.* at 195.

[129] *Id.*

bathroom."[130] Ms. Kelly indicated that A.G. met the Milliman Care Guidelines as "evidenced by multiple areas of impairment in daily living, need for medication management and mood stabilization/safety planning."[131] As a result, Blue Cross authorized fifteen days of residential treatment.[132]

On April 28, 2014, Ms. Walker conducted another call with Ms. Beers. Ms. Walker noted that A.G. had increasing irritability and impulsivity.[133] She had labile affect, irritable mood, and very poor insight/judgment.[134] Ms. Walker noted that A.G. was extremely impulsive, was a flight risk, and had poor insight into her actions and consequences.[135] Ms. Walker also noted that A.G. would see a psychiatrist that week for a medication evaluation.[136] Blue Cross authorized an additional four days of residential treatment, citing the Milliman Care Guidelines and the "severe dysfunction in the family and need for medication evaluation to be completed."[137]

Blue Cross authorized an additional seven days on May 1, 2014, noting the need to monitor medications, mood stabilization, and multiple areas of dysfunction in daily living.[138]

---

[130] *Id.* at 195–96.

[131] *Id.* at 196.

[132] *Id.*

[133] *Id.* at 191.

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] *Id.* at 190.

On May 9, 2014, Ms. Walker noted that A.G. continued to have an extreme level of irritability.[139] She had a visit with her parents, but it went poorly.[140] A.G. was considered an extreme flight risk, lacked insight, and had continued opposition to treatment.[141] Based on the "Milliman, ASAM and/or TAC CD guidelines," an additional day of treatment was authorized.[142] Three additional days were then authorized so a shaping review could be conducted.[143]

On May 12, 2014, Dr. Clifford Moy, Blue Cross' Medical Director, conducted a shaping review with Dr. Marshall. Dr. Moy found that A.G. met the Milliman Care Guidelines for mental health residential treatment based on "ongoing defiance and medication titration; history [of] higher risk of running away."[144] As a result, an additional seven days of treatment were authorized.[145]

By May 19, 2014, the last date of authorized coverage, Blue Cross noted that Plaintiff continued to have a labile mood, irritable affect, a lack of insight, and very poor judgment.[146] The Aerial notes from Blue Cross reflect that A.G. made no progress since the prior review on

---

[139] *Id.* at 187.

[140] *Id.*

[141] *Id.*

[142] *Id.* at 188.

[143] *Id.* at 186.

[144] *Id.*

[145] *Id.*

[146] *Id.* at 184.

May 12, was non-compliant with therapy, and was a continued flight risk.[147]  Despite this, Ms.

Walker found that A.G. did not meet the Milliman Care Guidelines.[148]

Dr. Moy then conducted a peer-to-peer review.  Dr. Moy also noted in his review that

there was "no improvement or change" in A.G.'s condition.[149]  Dr. Moy found that A.G. had no

suicidal or homicidal ideation and no psychosis.  He further noted that she was not aggressive.

Dr. Moy found that A.G. may require a structured living situation, but did not appear to benefit

from treatment.  Thus, residential care was not required, and mental health partial

hospitalization/day treatment was recommended.  As a result, Blue Cross determined that A.G.

did not meet the Milliman Care Guidelines criteria for residential treatment and denied further

benefits.[150]

On May 20, 2014, Blue Cross issued its initial denial letter to Plaintiffs.[151] The letter

explained: "You were not reported as being an imminent danger to self or others. There was no

report of psychosis or mania.  From the clinical evidence, you can be safely treated in a less

restrictive setting such as MH Partial Hospitalization/Day Treatment (PHP)."[152]

Plaintiffs submitted a first level appeal of the Uinta denial on November 13, 2014.  On

December 4, 2014, Dr. Frank Webster, the Senior Medical Director for Behavioral Health for

---

[147] *Id.*

[148] *Id.* at 185.

[149] *Id.* at 183.

[150] *Id.*

[151] *Id.* at 255–66.

[152] *Id.* at 255.

Blue Cross, conducted a paper review.[153]  Dr. Webster noted that he reviewed the Aerial notes

and the notes from Uinta, as well as letters from A.G.'s outpatient providers.[154]  Dr. Webster

concluded:

> Patient Does not meet criteria for RTC based on Milliman guidelines.  Patient is not suicidal, homicidal, or psychotic.  She is not aggressive.  Patient appears to be functioning fairly well and appears to be at her baseline level of functioning. Patient has some chronic maladaptive behaviours, [sic] and impulsive behaviours [sic] as well that place her a [sic] at a chronically elevated risk for impulsive behaviour, [sic] but these do not occur at a frequency that require a residential level of care, and has no acute risk of harm to self or others.  Patient continues to be oppositional with family at times.  She is occasionally oppositional in the program (these behaviours [sic] appear infrequent), but not at level that could not be managed as an outpatient. It appears that she could be managed in a lower level of care such as outpatient therapy with intensive family therapy.[155]

On December 4, 2014, Blue Cross issued its denial letter, rejecting Plaintiffs' first level

appeal.[156]  The denial letter stated that A.G. did not meet the Milliman Care Guidelines for

mental health residential treatment for the following reasons:

> You were not suicidal, homicidal or psychotic. You were not aggressive. You appeared to be functioning fairly well, and at the baseline level of functioning. You had some chronic maladaptive behaviours [sic],and impulsive behaviours [sic] as well that placed you at a chronically elevated risk for impulsive behaviour, [sic] but these do not occur at frequency that require residential level of care. You had no acute risk of harm to yourself or others. You continued to be oppositional with family at times. You were occasionally oppositional in the program (these behaviours [sic] appear infrequent), but not at a level that could not be managed as an outpatient.  It appeared that you could be managed in a lower level of care such as outpatient therapy with intensive family therapy.  From the clinical evidence you

---

[153] *Id.* at 179.

[154] *Id.*

[155] *Id.* at 180.

[156] *Id.* at 222–31.

could have been safely treated in a less restrictive setting such as MENTAL HEALTH PARTIAL HOSPITALIZATION/DAY TREATMENT (PHP).[157]

On January 29, 2015, Plaintiffs requested an independent external review by an Independent Review Organization ("IRO"). On March 3, 2015, the IRO, Core 400 LLC, issued a decision upholding Blue Cross' denial of benefits for A.G.'s treatment at Uinta. The decision stated:

> By the date of service, 05/20/14, the patient's behavior had stabilized. The patient denied suicidal and homicidal ideation. There is no indication that the patient was [an] imminent risk of harm to herself or others. The patient was not psychotic. The patient was not aggressive at that time. Although the patient continued with some chronic maladaptive behaviors and impulsive behavior, these incidents did not occur at a frequency that would require this level of care. The submitted records indicate that the patient could have been effectively treated at a lower level of care as of the date in question. Discharge guidelines indicate that residential care is no longer necessary due to adequate patient stabilization or improvement as indicated by all of the following: risk status acceptable, functional status acceptable and medical needs manageable. The submitted clinical records indicate that these criteria had been met as of 05/20/14. As such, it is the opinion of the reviewer that the request for mental health residential treatment 5/20/2014 forward is not recommended as medically necessary and the prior denials are upheld.[158]

## II.  STANDARD OF REVIEW

In an ERISA case, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[159]

---

[157] *Id.* at 222–23.

[158] *Id.* at 2452.

[159] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (*quoting Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

The parties agree that the Court should employ a de novo standard of review. The Court will accept this stipulation. Under the de novo standard, the Court's task "is to determine whether the administrator made a correct decision."[160] Thus, the question "is whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review."[161]

## III. DISCUSSION

A. OUTBACK

The Plan provides that "Medically Necessary Mental Health Care or treatment of Serious Mental Illness in a Psychiatric Day Treatment Facility, a Crisis Stabilization Unit or Facility, or a Residential Treatment Center for Children and Adolescents, in lieu of hospitalization, shall be Inpatient Hospital Expense."[162] However, "[r]esidential treatment centers for mental health services other than treatment for children and adolescents" are excluded.[163] Here, while Outback provides residential treatment, there is no evidence that Outback is a Residential Treatment Center for Children and Adolescents as defined by the Plan.

A Residential Treatment Center for Children and Adolescents is "a child-care institution which is appropriately licensed and accredited by the Joint Commission on Accreditation of Healthcare Organizations or the American Association of Psychiatric Services for Children as a residential treatment center for the provisions of Mental Health Care and Serious Mental Illness

---

[160] *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (quoting *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)).

[161] *Id.* at 833.

[162] R. at 76.

[163] *Id.* at 66.

services for emotionally disturbed children and adolescents."[164]  There is no dispute that Outback was not so licensed and accredited.  Therefore, it does not fall within the Plan terms for coverage, thereby becoming excluded under the residential treatment center exclusion.

Plaintiffs argue that coverage at Outback was appropriate because wilderness programs are not specifically excluded under the Plan.  The fact that there is no specific exclusion for wilderness programs is irrelevant.  Coverage for treatment at Outback was not denied because Outback was a wilderness program.  Rather, coverage was denied because Outback was not a residential treatment center as defined by the Plan and, therefore, A.G.'s treatment there was not covered by the Plan.

Plaintiffs further argue that A.G.'s treatment at Outback should have been covered because the Plan's definition of Mental Health Care includes the type of treatment she received at Outback.  Plaintiffs' argument conflates the definition of certain defined terms with the coverage of services.  While the definition of Mental Health Care is broad, the definition does not necessarily equate to coverage.  To determine coverage, the Court must look not just to the definitions, but also to the covered medical services set out in the Plan.  For example, Plaintiffs cite to Paragraph 2 of the definition of Mental Health Care to support their claim, but this paragraph requires an Eligible Expense.[165]  Eligible Expense, in turn, is defined as "Inpatient Hospital Expenses, Medical-Surgical Expenses, Extended Care Expenses, or Special Provisions Expenses, as described in this Benefit Booklet."[166]  As stated, Inpatient Hospital Expense does

---

[164] *Id.* at 83.

[165] *Id.* at 79.

[166] *Id.* at 72.

23

include Mental Health Care or treatment of a Serious Mental Illness.[167]  However, that coverage

only applies to a Psychiatric Day Treatment Facility, a Crisis Stabilization Unit or Facility, or a

Residential Treatment Center for Children and Adolescents.[168]  There is no evidence that

Outback fits any of these definitions.

Further, under Paragraph 5 of the definition of Mental Health Care, coverage is limited to

mental health care performed in or by a Hospital, Facility Other Provider, or other licensed

facility or unit providing such care.[169]  There is no evidence that Outback is a Hospital as defined

by the Plan.  The definition of "Facility Other Provider" is also limited and would include, as

relevant here, a Psychiatric Day Treatment Facility, a Crisis Stabilization Unit or Facility, or a

Residential Treatment Center for Children and Adolescents.[170]  Again, there is no evidence that

Outback falls into one of these categories.  While the argument could be made that Outback is an

"other licensed facility or unit providing such care," that term must be read in conjunction with

the rest of the Plan limitations.[171]  By focusing exclusively on the definitions of certain terms,

Plaintiffs fail to address whether the treatment A.G. received was a covered medical expense

under the terms of the Plan.  For the reasons set forth above, the Court concludes that it is not.

---

[167] *Id.* at 76.

[168] *Id.* ("Medically Necessary Mental Health Care or treatment of Serious Mental Illness in a Psychiatric Day Treatment Facility, a Crisis Stabilization Unit or Facility, or a Residential Treatment Center for Children and Adolescents, in lieu of hospitalization, shall be Inpatient Hospital Expense.").

[169] *Id.* at 79.

[170] *Id.* at 80.

[171] *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1511 (10th Cir. 1996) ("In interpreting the terms of an ERISA plan we examine the plan documents as a whole . . . .").

Plaintiffs further argue that the Court cannot consider Defendant's arguments made with respect to their denial of coverage for treatment at Outback because it did not respond to their first level appeal. "A plan administrator is required by statute to provide a claimant with the specific reasons for a claim denial."[172] "Thus, the federal courts will consider only those rationales that were specifically articulated in the administrative record as the basis for denying a claim."[173] "A plan administrator may not treat the administrative process as a trial run and offer a post hoc rationale in district court."[174]

Here, Blue Cross denied coverage for Outback because it was not covered under the terms of the Plan. Blue Cross makes the same argument here. Thus, it is proper to consider the arguments made by Blue Cross in relation to this claim. This is not a situation where "[t]he specific reasons and specific provisions supporting Defendant's . . . argument have changed" and it has presented an "after-the-fact interpretation of an entirely different section of the Plan."[175] Therefore, Plaintiffs' argument must be rejected and the Court will uphold the denial of benefits for Outback.

B.      UINTA

As discussed above, A.G. resided at Uinta from April 13, 2014, to December 6, 2015. Blue Cross approved A.G.'s treatment at Uinta from April 13, 2014, to May 19, 2014. After that

---

[172] *Spradley v. Owens-Ill. Hourly Emps. Welfare Benefit Plan*, 686 F.3d 1135, 1140 (10th Cir. 2012) (citing 29 U.S.C. § 1133).

[173] *Id.* (internal quotation marks and citation omitted).

[174] *Id.* at 1140–41 (internal quotation marks and citations omitted).

[175] *Id.* at 1141.

date, Blue Cross determined that further residential treatment was no longer medically necessary. Plaintiffs argue that Blue Cross' declination of coverage beyond May 19, 2014, was incorrect.

Blue Cross primarily used the Milliman Care Guidelines in determining the medical necessity of A.G.'s treatment at Uinta. The Milliman Care Guidelines provide that admission to residential acute level of care is appropriate as indicated by all of the following:

- Around-the-clock behavioral care is necessary for treatment because of 1 or more of the following:
  - Imminent danger to self is present due to **1 or more** of the following:
    - Imminent risk for recurrence of Suicide attempt or act of serious Harm to self is present as indicated by **ALL** of the following:
      - There has been a very recent Suicide attempt or deliberate act of serious Harm to self.
      - There has not been Sufficient relief of the factors that precipitated the attempt or act.
    - Current plan for suicide or serious Harm to self is present.
    - Command auditory hallucinations for suicide or serious Harm to self are present.
    - The patient is engaging in dangerous behavior, or has persistent Thoughts of suicide or serious Harm to self, or suicide trigger state without formed thoughts, that cannot be adequately monitored at lower level of care as indicated by **1 or more** of the following:
      - The necessary child or adolescent behavioral care (such as the required provide or lower level facility) is not available or is insufficient.
      - Severe conflict in family environment or other inadequacy in patient support system is present.
      - Patient characteristic such as high impulsivity, unreliability, or extreme agitation with desperation are present.
      - Ruminative flooding; uncontrollable and overwhelming profusion of negative thoughts are present.
      - Frantic hopelessness; fatalistic conviction that life will not improve along with oppressive sense of entrapment and doom is present.
  - Imminent danger to others due to **1 or more** of the following:
    - Imminent risk for recurrence of an attempt to seriously Harm another is present as indicated by **ALL** of the following:
      - There has been a very recent attempt to seriously Harm another.
      - There has not been Sufficient relief of the factors that precipitated the attempt or act.

- - Current plan for homicide or serious Harm to another is present.
  - Command authority hallucinations or paranoid delusions contributing to risk for homicide or serious Harm to another are present.
  - The patient has persistent thoughts of, or violent impulsive act that could likely result in, homicide or serious Harm to another that cannot be adequately monitored at lower level of care as indicated by **1 or more** of the following:
    - The necessary child or adolescent behavioral care (such as the required provide or lower level facility) is not available or is insufficient.
    - Severe conflict in family environment or other inadequacy in patient support system is present.
    - Patient characteristic such as high impulsivity or unreliability are present
- Life-threatening inability to receive adequate care from caregivers is present (such as neglect from caregivers or inability to receive necessary care at lower level of care).
- Severe disability or disorder requiring acute residential intervention is present as indicated by **ALL** of the following:
  - Severe behavioral health disorder-related symptoms or conditions are present as indicated by **1 or more** of the following:
    - Major dysfunction in daily living is present (e.g., family, interpersonal, school functioning).
    - Severe problem with cognition, memory, or judgment is present.
    - Severe psychiatric symptoms are present (e.g., hallucinations, delusions, other acute psychotic symptoms, mania, severe autistic behaviors).
    - Evidence of severely diminished ability to assess consequences of own actions is present (e.g., acts of severe property damage).
    - Frequent extreme external (extreme angry outbursts) or internal (extreme sulking and rumination) anger manifestations are present.
    - A high level of family conflict is present.
  - Patient management for the symptoms or condition at highest nonresidential level of care has failed of is not feasible at present.
- Severe comorbid substance use disorder is present that must be controlled (e.g., abstinence necessary) to achieve stabilization of primary psychiatric disorder.
- Patient currently has stabilized during inpatient treatment stay for severe symptoms or behavior and requires structured setting with continued around-the-clock behavioral care.
- There are no exclusions to treatment: situation and expectations are appropriate for residential level as indicated by **ALL** of the following:
  - Recommended treatment is necessary, appropriate, and not feasible at a lower level of care (i.e., documented behavior, symptoms, or risk judged not appropriate for partial hospital, IOP, or acute outpatient care).

- Very short-term crisis intervention and resource planning for further care at a nonresidential level is unavailable or judged inappropriate.
- Patient has at least some minimal motivation to participate in treatment within a highly structured setting at the direction of a parent guardian.
- There is no anticipated need for physical restraint, seclusion, or other involuntary control (e.g., patient not actively violent).
- There is no need for around-the-clock medical or nursing care.
- Patient has sufficient cognitive capacity to respond to planned individual and group treatment components.
- Adequate response (e.g., stabilization for nonresidential level of care) to planned treatment is expected within a limited time period.[176]

The Milliman Care Guidelines provide that residential care is needed until one or more of the following conditions are met:

- o Residential care no longer necessary due to adequate patient stabilization or improvement as indicated by **ALL** of the following:
  - ▪ Risk status acceptable as indicated by **ALL** of the following:
    - Patient has not recently made a Suicide attempt or act of serious self Harm, or has had Sufficient relief of precipitants of any such action.
    - Absence of Current plan for suicide or serious self Harm for at least 24 hours.
    - Thoughts of suicide, homicide, or serious Harm to self or to another are absent or manageable at available lower level of care.
    - Patient and supports understand follow-up treatment and crisis plan.
    - Provider and supports are sufficiently available at lower level of care.
    - Patient can participate (e.g., verify absence of plan for harm) in needed monitoring.
  - ▪ Functional status acceptable as indicated by **1 or more** of the following:
    - No essential function is significantly impaired.
    - An essential function is impaired, but impairment is manageable at available lower level of care.
  - ▪ Medical needs manageable as indicated by **ALL** of the following:
    - Adverse medication effects absent or manageable at available lower level of care.
    - Medical comorbidity absent or manageable at available lower level of care.
    - Substance withdrawal absent or manageable at available lower level of care.

---

[176] R. at 240–42.

- o Residential care no longer appropriate due to patient progress record or consent as indicated by **1 or more** of the following:
    - ▪ Patient deterioration requires higher level of care.
    - ▪ Patient or guardian no longer consents to treatment.[177]

Before addressing whether Plaintiffs have shown entitlement to benefits, the Court must address ancillary arguments raised by Plaintiffs. First, Plaintiffs argue that Blue Cross cannot rely on the Milliman discharge guidelines because the denial letters referenced the admission guidelines.

There is some confusion in the record as to whether Blue Cross applied the Milliman Care Guidelines for admission as opposed to discharge when denying further coverage. The denial letters both reference the admission guidelines. The Aerial notes are silent as to whether the admission or discharge guidelines were used. The Core 400 analysis clearly indicates that the discharge guidelines were considered. Because the Court's review is de novo, any incorrect reliance on the admission guidelines does not affect the Court's analysis. Plaintiffs have the burden of demonstrating that residential treatment was medically necessary.

Relatedly, Plaintiffs argue that Blue Cross cannot now argue matters related to the discharge guidelines. Doing so would "give permission to [Blue Cross] to sandbag Mike and Dana 'by after-the-fact plan interpretations devised for purposes of litigation.'"[178] This is not a case where Blue Cross has offered one explanation for denying benefits during the claims review process and another during litigation. Rather, Blue Cross has consistently stated that the reason

---

[177] *Id.* at 244.

[178] Docket No. 41, at 14 (quoting *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1191 (10th Cir. 2007)).

for its denial was that residential treatment was not medically necessary. On de novo review, it is this Court's job to make an independent determination as to whether the decision was correct.

Next, Plaintiffs argue that the Milliman Care Guidelines are overly restrictive in that they limit residential treatment to acute care where residential treatment should be considered sub-acute care. Even accepting this argument, Plaintiffs are incorrect in stating that Blue Cross only used the Milliman Care Guidelines in determining whether continued residential treatment was medically necessary. Rather, the reviewers relied on their own medical expertise in making their determinations. Further, the reviewers did recommend sub-acute levels of care, including partial hospitalization. This demonstrates that Blue Cross did consider whether sub-acute care was appropriate. Thus, the Court rejects Plaintiffs' claim that Blue Cross used improper criteria when considering A.G.'s need for residential treatment. While Plaintiffs have provided the Court with other medical necessity criteria to support their argument that reliance on the Milliman Care Guidelines was inappropriate,[179] they have not provided any meaningful analysis of that criteria or how A.G. would have qualified for continued residential treatment under those guidelines. Therefore, the Court cannot conclude that Blue Cross erred when it used the Milliman Care Guidelines.

Having resolved these issues, the Court turns to the merits of Plaintiffs' claim. Plaintiffs argue that continued residential treatment was necessary up until A.G.'s discharge from Uinta. Plaintiffs point to treatment notes after May 19, 2014, to demonstrate that A.G. continued to have problems after Blue Cross denied further benefits. However, the fact that A.G. continued to

---

[179] Docket No. 55.

suffer from behavioral issues does not demonstrate that continued residential treatment care was medically necessary. Plaintiffs have not and cannot demonstrate that A.G.'s entire stay at Uinta was medically necessary. As the treatment notes before the Court indicate, A.G. made good progress during her stay at Uinta and could have been treated at a lower level of care. However, Plaintiffs have shown by a preponderance of the evidence that additional residential treatment was medically necessary beyond May 19, 2014.

The first evidence for medical necessity can be found in Blue Cross' treatment of Plaintiffs' claim. As stated, Plaintiff was first admitted to Uinta on April 13, 2014. After admission, Blue Cross continually evaluated the medical necessity of A.G.'s treatment at Uinta. Blue Cross continually found that residential treatment was medically necessary up until May 19, 2014. However, a close examination of two dates—May 12 and May 19—demonstrates that Blue Cross' decision that continued residential treatment was no longer medically necessary after May 19 lacks any evidentiary support.

On May 12, 2014, Dr. Moy conducted a shaping review with Dr. Marshall. Dr. Moy concluded that A.G. met the Milliman Care Guidelines for mental health residential treatment based on "ongoing defiance and medication titration; history [of] higher risk of running away."[180] The following week, on May 19, 2014, additional reviews were conducted by both Ms. Walker and Dr. Moy. Ms. Walker noted that Plaintiff had a labile mood, irritable affect, a lack of insight, and very poor judgment.[181] She further noted that A.G. made no progress since

---

[180] R. at 186.

[181] *Id.* at 184.

the prior review, was non-compliant with therapy, and was a continued flight risk.[182]  Dr. Moy also noted that there was "no improvement or change" in A.G.'s condition.[183]  Despite this, both Ms. Walker and Dr. Moy concluded that residential treatment was no longer medically necessary.

Blue Cross's decision is internally inconsistent.  It is incongruous for Blue Cross to state on May 12, 2014, that A.G. qualified for residential treatment and then, after stating that there was no improvement or change in her condition, that she somehow no longer qualified for residential treatment a mere seven days later.  Moreover, there is nothing in the treatment notes during this period that would indicate an improvement in A.G.'s condition.  Indeed, there appear to be no treatment notes from this time period at all.  There is simply no evidence to indicate that A.G. improved at all between May 12 and May 19 such that residential treatment was no longer medically necessary.  Even the charts created by Blue Cross to support its decision primarily rely on treatment notes created after May 19, 2014.[184]  Thus, there is nothing to support Blue Cross' determination to terminate benefits as of that date.

In addition to the inconsistent treatment of A.G.'s claim, Plaintiffs has provided the statements from her treatment providers, all of whom indicate that A.G. either required or would benefit from a higher level of care.[185]  These statements were provided to Blue Cross in

---

[182] *Id.*

[183] *Id.* at 183.

[184] Docket No. 34, at 30–31; Docket No. 45, at 14–15.

[185] R. at 1457 ("It is of medical necessity that she be placed in a higher level of care with close supervision and ongoing intensive therapy and medication management for her safety."); *id.* at 1460 (A.G. "is seriously in need of long-term treatment if she is to survive, and hopefully thrive."); *id.* at 1478 ("A residential treatment center might be considered in order to stabilize" A.G.); *id.* at 1488 ("At this point in time, given that she has not demonstrated the ability to keep

conjunction with Plaintiffs' first level appeal. These statements provide further evidence that residential treatment beyond May 19, 2014, was medically necessary.

To counter this evidence, Blue Cross points to the determinations made on appeal and by independent examiner Core 400. Reliance on these determinations is troubling, however, because they both relied on treatment notes created after May 19, 2014, to support the conclusion that further treatment was not medically necessary after that date. It is true that there is considerable evidence that A.G.'s condition improved during her stay at Uinta such that residential treatment was no longer medically necessary. However, as discussed, the evidence does not support the claim that such treatment was no longer medically necessary as of May 19, 2014. None of the reviewers indicate the influence A.G.'s later improvement had on their decisions. Moreover, both the appeal and the Core 400 examination were premised, at least in part, on the assumption that A.G.'s condition on May 19, 2014, represented her baseline level of functioning. The further assumption being that A.G.'s condition would not improve with continued residential treatment. As the treatment notes reflect, this was an incorrect assumption. A.G.'s level of function did improve with further treatment. Thus, Plaintiff has shown that Blue Cross' decision to deny continued residential treatment after May 19, 2014, was incorrect.

The more difficult question becomes when residential treatment stopped being medically necessary. The treatment notes contained in the record reflect that, while still struggling occasionally, A.G. had made substantial progress and was functioning quite well. She had

---

herself safe, follow basic rules and boundaries, continues to have an unregulated mood disorder, is highly impulsive, and emotionally fragile, I continue with my recommendation for long-term, residential treatment.").

multiple off-site visits, spent Christmas at home with her family, was pleasant and engaged with treatment, and otherwise met the discharge criteria. Thus, the Court cannot accept Plaintiffs' argument that residential treatment was medically necessary during the entire period of A.G.'s stay at Uinta. The discharge summary provided to the Court at the hearing does not alter this conclusion because it does not comport with the treatment notes contained in the record. If A.G.'s condition deteriorated between June 30, 2015—the date of the last treatment notes in the record—and her discharge date, that evidence was not presented to Blue Cross and, even if it could be considered,[186] is not before the Court.

At the hearing, Blue Cross provided four potential alternative dates on which residential treatment was no longer medically necessary: June 30, 2014; August 13, 2014; October 30, 2014; and November 21, 2014. The first two dates are problematic because they do not address A.G.'s self-harming behavior in September 2014, nor do they address Ms. Beers' October 10 letter, in which Ms. Beers stated A.G. required continued residential treatment. October 30, 2014, is similarly problematic because A.G. was out of instructional control the following two days. However, the Court agrees that Plaintiff has failed to show continued residential treatment was medically necessary after November 21, 2014. By this point, A.G.'s condition had improved such that residential treatment was no longer medically necessary. This is reflected in the treatment notes discussed above. While Ms. Beers stated on November 20, 2014, that A.G. had not demonstrated an ability to generalize her skills in her home environment, this statement

---

[186] *See Hall v. UNUM Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002) (providing that the court may consider extra-record evidence upon de novo review in exceptional circumstances).

is contradicted by the fact that A.G. left campus the following day for a visit with her mother. Additionally, the treatment notes after November 21, 2014, while not always positive, demonstrate that A.G.'s condition had improved. There were no more instances of self-harm or being out of instructional control. Rather, they indicate that A.G. was doing well overall and could be treated at a lower level of care. Therefore, the Court concludes that November 21, 2014, is the last day that continued residential treatment was medically necessary.

## C.    PARITY ACT

Before addressing the merits of Plaintiffs' claim under the Mental Health Parity and Addiction Equity Act (the "Parity Act"), the Court must consider Blue Cross' argument that Plaintiff has failed to plead a claim under the Parity Act.[187] "Congress enacted the Parity Act as an amendment to ERISA, making it enforceable through a cause of action under 29 U.S.C. § 1132(a)(3) as a violation of a 'provision of this subchapter.'"[188] Plaintiffs' Complaint does not assert a claim under § 1132(a)(3), only a single claim for benefits under § 1132(a)(1)(B). However, both parties have operated under the assumption that Plaintiffs have asserted a Parity Act claim and have requested summary judgment on that claim. Thus, there is no reason not to address this claim.[189] Further, Plaintiffs have suggested that amendment, rather than dismissal, is appropriate. Because of the posture of this case, dismissal of the Parity Act claim would put form over substance and would run counter to the principles governing the amendment of

---

[187] Plaintiffs also mention the Patient Protection and Affordable Care Act ("ACA") in their Complaint, but it does not appear they are pursuing a claim under that statute. Nor is it clear that Plaintiffs would have the ability to do so.

[188] *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1259 n.118 (D. Utah 2016).

[189] *Id.* ("Because the Plan makes nothing of the F. Family's failure to bring its claim under § 1132(a)(3), neither will the court.").

pleadings. Further, because the Parity Act claims fail on the merits, formal amendment is unnecessary.

Turning to the merits of Plaintiffs' claim, "Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."[190] The Act requires that a plan's treatment and financial limitations on mental health or substance abuse disorder benefits be no more restrictive than the limitations for medical and surgical benefits.[191] Thus, as relevant here, a plan cannot impose restrictions based on facility type.[192] Similarly, a plan may not apply more stringent limitations to mental health benefits than are applied to medical/surgical benefits.[193]

### 1.  Outback

Plaintiffs' Parity Act claim with respect to Outback is somewhat confusing. Plaintiffs appear to argue that Outback qualifies as a Residential Treatment Facility under the terms of the Plan and coverage was only denied because Outback is an outdoor wilderness program. However, as discussed above, Outback is not a Residential Treatment Facility under the Plan and coverage was denied for this reason. Thus, the denial was not based on the type of facility, but rather on the fact that Outback did not qualify as a Residential Treatment Center under the terms of the Plan. Moreover, Plaintiffs have failed to point to anything suggesting that there is a

---

[190] *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016).

[191] *See* 29 U.S.C. § 1185a(a)(3)(A)(ii).

[192] 29 C.F.R. § 2590.712(c)(4)(ii)(H).

[193] *Id.* § 2590.712(c)(4)(i).

medical/surgical analogue to the treatment provided at Outback that has created a disparity prohibited by the Act. Therefore, this claim fails.

2.     *Uinta*

Plaintiffs' Parity Act argument with respect to Uinta is also somewhat unclear. Plaintiffs appear to argue that Blue Cross used improper, more stringent, criteria in determining the medical necessity of A.G.'s continued stay at Uinta.

The Parity Act regulations state:

> A group health plan (or health insurance coverage) may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.[194]

Under these regulations, it would be inappropriate for Blue Cross to apply more stringent standards for mental health benefits than it does to medical/surgical benefits. However, there is no evidence to support Plaintiffs' argument that Blue Cross did so here. Rather, the same standard—medical necessity—is applied to both mental health benefits and medical/surgical benefits and there is no evidence that the guidelines used to determine whether continued inpatient mental health treatment is medically necessary are more stringent than the guidelines used to determine whether continued inpatient treatment is necessary for medical/surgical benefits. Plaintiffs argue that the Milliman Care Guidelines improperly apply acute requirements for sub-acute residential mental health treatment, but there is no evidence before the Court that

---

[194] *Id.*

Blue Cross applied less stringent requirements for medical/surgical benefits. Without such evidence, Plaintiffs' Parity Act claim must fail.

## D.     ATTORNEY'S FEES, COSTS, AND PREJUDGMENT INTEREST

Pursuant to 29 U.S.C. § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." "A court may award fees and costs under 29 U.S.C. § 1132(g)(1) as long as the fee claimant has achieved some degree of success on the merits."[195]

The Tenth Circuit has established five factors a court may consider in deciding whether to exercise its discretion to award attorney's fees and costs:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.[196]

"No single factor is dispositive and a court need not consider every factor in every case."[197]

Considering these factors, an award of attorney's fees and costs is not warranted. There is no evidence of bad faith on the part of Blue Cross. Moreover, there is nothing to suggest that an award of attorney's fees will deter others. Further, this dispute revolves around a fact-intensive situation and does not benefit other Plan participants or beneficiaries, nor does it

---

[195] *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (internal quotation marks and citation omitted).

[196] *Id.*

[197] *Id.*

resolve a significant legal issue. Finally, both parties have somewhat meritorious positions. Based upon these considerations, Plaintiffs' request for attorney's fees and costs is denied.

The Court has the discretion to award prejudgment interest. "Prejudgment interest is appropriate when its award serves to compensate the injured party and its award is otherwise equitable."[198] "Calculation of the rate for prejudgment interest . . . rests firmly within the sound discretion of the trial court."[199] "Courts commonly look to state statutory prejudgment interest provisions as guidelines for a reasonable rate."[200]

Here, an award of prejudgment interest will compensate Plaintiffs for the financial hardship incurred in paying the costs of A.G.'s treatment that should have been covered. Further, the equities do not preclude an award of prejudgment interest. Therefore, the Court will award prejudgment interest at a rate to be determined.

## IV. CONCLUSION

It is therefore

ORERED that the parties' Motions for Summary Judgment (Docket Nos. 33 and 36) are GRANTED IN PART AND DENIED IN PART as set forth above. Within fourteen days (14) of this Order, Plaintiffs are directed to submit a brief outlining their request for damages and prejudgment interest consistent with this Order. Defendant may respond within fourteen (14) days thereafter.

---

[198] *Allison v. Bank One-Denver*, 289 F.3d 1223, 1243 (10th Cir. 2002).

[199] *Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1016 (10th Cir. 2008) (internal quotation marks and citation omitted).

[200] *Id.*

DATED this 4th day of June, 2019.

BY THE COURT:

_____

Ted Stewart
United States District Judge